Jose CAMPOS, Plaintiff–Appellant,

v.

CITY OF PEORIA, Defendant–
Appellee.

No. 02–2638.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 17, 2002.

Decided Jan. 14, 2003.

Before BAUER, CUDAHY, and
COFFEY, Circuit Judges.

### ORDER

In December 1999, Jose Campos, a Hispanic police officer, was forced to resign from the Peoria Police Department. Three months earlier, on September 23, he had allegedly made a serious mistake at a simulated firearms (or "simunitions") exercise, firing several shots at a surrendering target. During a debriefing that followed the exercise, he had also allegedly made some inappropriate remarks, claiming that it was acceptable to shoot anyone in a room or a car from which shots had been fired. Following an investigation of these events, Police Chief John Stenson decided that Campos should no longer serve on the force. Stenson claimed that he based the decision primarily on the events of September 23, but that he also took into account Campos's considerable disciplinary history.[1] He offered Campos an ultima-

---

1. Campos's disciplinary history included: (a)    a five-day suspension for failure to renew his

tum: resign by December 3 or be fired. Campos resigned. He was convinced, though, that the Department's actions were motivated not by the remarks at the training session (which he denies having made), but rather by a complaint he had filed with the Equal Employment Opportunity Commission on November 12, alleging racial discrimination. He therefore filed another EEOC complaint, this time for retaliation. After the EEOC dismissed both charges, Campos brought both his claims to federal court.

The district court concluded that Campos had failed to establish a prima facie case of either discrimination or retaliation. Nor, the court found, had Campos shown that the reason given for his discharge was pretextual. The court therefore granted the Department's request for summary judgment.

On appeal, Campos has abandoned his discrimination claim, but argues that summary judgment was inappropriate with respect to his retaliation claim. He offers two reasons: (1) The Department began its formal investigation on November 12–the very day on which Campos filed his EEOC complaint, but a full seven weeks after the events the Department was supposedly investigating. Campos argues that this strongly suggests–indeed, directly shows without need for further inference–that the investigation and consequent dismissal were in fact retaliatory.[2] (2) Campos has denied both that he fired at the surrendering target and that he said the

things that were attributed to him. He argues that this creates a triable issue as to what really happened, and therefore as to whether the Department's explanation for Campos's dismissal was pretextual.

■ When a plaintiff alleges retaliation under Title VII, he can get his case past summary judgment in one of two ways. Either he must show a direct, "but-for" causal connection between the complaint and the retaliation, or he must rely on the familiar *McDonnell Douglas* burden-shifting method. *See Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir.2002); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The district court analyzed Campos's claim using the *McDonnell Douglas* method, which is the correct approach in cases where "the plaintiff . . . has no actual evidence of discrimination (or retaliation) but just some suspicious circumstances." *Stone*, 281 F.3d at 643. But Campos argues that the court should have treated his evidence of suspicious timing as showing retaliation directly, rather than indirectly and circumstantially.

In making this argument, Campos relies mainly on the seven-week gap between the simunitions incident and the start of the investigation, but cites no cases in which this sort of suspicious delay is used to demonstrate a retaliatory motive. Even giving him the benefit of the doubt on this

driver's license; (b) a five-day suspension for discourtesy; and (c) an eight-day suspension for failure to display license plates or registration sticker on his personal vehicle. Additionally, while on suspension, he missed a court date in which he was scheduled to testify, resulting in the case's dismissal.

2. Campos also mentions another investigation that was initiated on November 12, involving a run-in between Campos and City Code En-

forcement Officer Carol Wagley. Campos had allegedly interfered with Wagley's efforts to have a car towed. Campos states that the towing incident took place on October 13, and sees the month-long delay as further demonstration of retaliatory motive. Because the Wagley investigation does not bring up any issues that are not already raised with respect to the simunitions investigation, we discuss only the latter in this order.

point, however, we do not believe that the district court could reasonably have agreed with Campos's claim. For one thing, there appears to be nothing particularly unusual about the length of time between the simunitions exercise and the final resolution of the investigation–previous disciplinary cases brought against Campos took even longer to resolve.[3] And although Campos argues that the Department's investigation was provoked by his EEOC complaint, which he filed on November 12, the investigation itself was based on a report that had been drafted by Sgts. Jeff Adams and Michael Ford on October 20, well before Campos had filed or considered filing any discrimination complaint. The report was fairly damning ("Officer Campos' performance [at the exercise] was abhorrent"), and would clearly have warranted an investigation into the underlying events. We do not see, therefore, how one might conclude that the timing in this case qualifies as direct evidence of retaliation. We therefore believe that the district court was correct to consider the timing as indirect evidence at best, and to analyze Campos's claims using the *McDonnell Douglas*-style analysis.

■ Campos also challenges the district court's conclusion that the Department successfully showed a noninvidious reason for the discharge (Campos's performance at the simunitions exercise, combined with his prior disciplinary history) and that Campos was unable to show that the reason was merely pretextual. Campos points out that his own testimony about what was said and done at the simunitions exercise is in conflict with the account of the four training officers present at the

exercise: he denies having fired at the surrendering target and denies having said afterwards that it was acceptable to shoot anybody in a room or a car from which shots had been fired. He suggests that this disagreement raises a material issue of fact as to the credibility of the Department's stated reason for his discharge. This, he argues, makes summary judgment inappropriate.

When it comes to showing pretext, however, it doesn't matter whether the Department's version of the events was correct, but only whether the Department believed its own version, and believed that those facts justified the action taken. *See Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir.2000). Campos therefore has to show either that the Department did not in fact believe in its reasons, or that those reasons were altogether unbelievable. *See id.; Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 395 (7th Cir.1998). The closest he comes to this is in his suggestion that the statements attributed to him were so outlandish that no one could really believe that he had said them. But in his own deposition, Campos testified to having raised a hypothetical question at the debriefing about responding to shots coming from a car; and another participant in the simunitions exercise, Officer James Chiola, testified that Campos had told him after the debriefing that "he [Campos] was playing devil's advocate in asking the questions he asked." We see room here for a good-faith misunderstanding. We therefore conclude that Campos has not managed to call into question the Department's sincerity.

3. On April 25, 1998, Campos had an inappropriate altercation with an arrestee; eighty days later, after an investigation, Campos received a five-day suspension. The next year, on August 24, 1999, Campos's personal car was found to be without license plates or registration sticker; an eight-day suspension was issued seventy-six days later. In comparison, only seventy-one days passed between the simunitions exercise and Campos's ultimate resignation.

Because we see nothing unusual about either the timing of the simunitions investigation or the Department's reliance on the findings of that investigation in seeking Campos's dismissal, we AFFIRM the district court's grant of summary judgment.